IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30382

_____

DONNELL WATSON,

Plaintiff-Appellant,

v.

JO ANN B. BARNHART, COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

--------------------

Appeal from the United States District Court
for the Eastern District of Louisiana

--------------------
April 8, 2002

Before EMILIO M. GARZA, BENAVIDES and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

Donnell Watson appeals the district court's dismissal of his 42 U.S.C. § 405(g) lawsuit, seeking review of the Administrative Law Judge's denial of disability benefits and supplemental security income.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 17, 1997, Donnell Watson filed an application for Title II disability benefits and Title XVI supplemental security income, alleging that due to a back injury he was unable to work after June 5, 1996. A hearing on the application before the Administrative Law Judge ("ALJ") resulted in a denial of benefits.

Watson requested an appeal with the Appeals Council, which was denied, and ultimately filed a complaint seeking judicial review.

At the time of the hearing before the ALJ, Watson was 51 and had a high school education. Most of his work experience was as a laborer and highway construction worker. Watson injured his back in a work-related accident, while carrying some pieces of iron. He alleged that the accident left him in pain, and unable to return to his work as a laborer.

The medical evidence regarding Watson's injuries is somewhat inconsistent. Early examinations did not find any significant problems except for some lower back distress that was resolving. Lumbar x-rays taken in May 1997 showed that he had mild degenerative disc disease of the lumbar spine and probable early degenerative changes of the hip joints. An MRI taken in October 1997 showed a broad-based disc protrusion at the L4-5 level, with bilateral recess compromise and nerve root contact.

One orthopaedist, Dr. Allen Johnston ("Dr. Johnston"), reviewed the MRI in March 1998 and found that it showed "clinically significant disc herniation." Dr. Johnston opined that the disc herniation would probably cause pain, and that Watson should avoid repetitive bending or twisting at the waist, should not work at unprotected heights, should not lift or carry more than 15-20 pounds, and should not stand or sit for greater than 25 to 30 minutes without being allowed to change positions for 5 minutes.

2

Another orthopaedist, Dr. Lawrence Messina ("Dr. Messina"), examined Watson in February 1998.  Dr. Messina found that Watson had degenerative disc disease and that he had restrictions in bending, sitting for long periods of time, and standing still for long periods of time.  However, Dr. Messina sent Watson to physical therapy, opining that Watson could be appropriately rehabilitated and returned to gainful employment with minimal restrictions.

During physical therapy, Watson reported alleviation of pain in his left leg, and only slight residual lower back pain.  Watson was able to increase the resistance in his back extension exercises from eighty to one hundred and fifty pounds.

Dr. Messina has testified that his examination of Watson did not reveal any objective abnormalities in his lower back, and that the majority of Watson's problems were caused by the degenerative process in his back.  He disagreed with Dr. Johnston's conclusion that the MRI showed a significantly herniated disc, but agreed with Dr. Johnston's assessment that Watson would have to avoid bending and standing for long periods of time.  He also testified that Watson's progression in physical therapy indicated that he could lift more than fifteen pounds, though he would not recommend lifting one hundred and fifty pounds.

Watson's own testimony regarding his injuries indicated at different points that he could stand for fifteen to twenty minutes without pain, and that he could stand for a "good while, maybe hours."  He testified that he could lift thirty to forty pounds

3

continuously and fifty pounds before it started hurting too much, and that he could lift two or three gallons of milk at a time (the ALJ noted that a gallon weighed 17 pounds). He also stated that he suffered from excruciating pain in his lower back and left leg, and that the pain had gotten worse since his injury, but that he experienced some improvement with physical therapy. He took painkillers and medication to help him sleep.

The ALJ concluded that Watson had degenerative disc disease, an impairment which was severe but did not meet the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Finding that Watson had an exertional capacity for medium work, the ALJ concluded that he was not disabled.

Before the district court, Watson argued that the ALJ erred in concluding that he could perform medium work, that the ALJ erred in applying the Medical-Vocational Guidelines without determining the extent of Watson's non-exertional impairment for back pain, and that the ALJ improperly failed to consider whether Watson could obtain and maintain employment under *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). On cross-motions for summary judgment, the district court denied Watson's motion and granted summary judgment in favor of the Commissioner of Social Security.

**DISCUSSION**

4

We review a Commissioner's decisions with respect to a denial of SSI benefits to ascertain (1) whether the final decision is supported by substantial evidence and (2) whether proper legal standards were used to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). "If the Secretary's decision is supported by substantial evidence, the findings are conclusive and must be affirmed." *Marcello v. Bowen*, 803 F.2d 851, 853 (5th Cir. 1986) (citing *Richardson,* 402 U.S. at 390). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Brown*, 192 F.3d at 496 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir.1990)).

I.  There is substantial evidence to support the ALJ's finding that Watson could perform medium work

Watson argues that the ALJ erred in finding that he was capable of performing medium work. Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §416.967. While Dr. Johnston restricted Watson to lifting no more than 15 to 20 pounds, Dr. Messina disagreed with that restriction, indicating that Watson could lift more weight than that. Watson's other

5

doctors did not place similar restrictions on lifting. Watson's own testimony indicated that he could lift up to 50 pounds, and that he could carry two to three gallons of milk at a time (weighing collectively 34 to 51 pounds). Thus, there was substantial evidence to support the ALJ's finding that Watson could perform medium work.

II.  The ALJ did not err in using the Medical-Vocational Guidelines

Where a claimant seeks to prove an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which... can be expected to last for a continuous period of not less than 12 months', 42 U.S.C. §§ 423(d)(1)(A), the ALJ is required to follow a five-step process. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The burden of proving the first four factors in the process is on the claimant. *Id.*[1] In the present case, the ALJ found that Watson had met his burden on the first four factors, so the burden shifted to the Commissioner to prove the fifth factor, namely, that Watson could perform other work.

---

[1]The factors are:

(1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" will not be found to be disabled.

(3) An individual who meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual is capable of performing the work he has done in the past, a finding of "not disabled" will be made.

(5) If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

*Id.*

At the fifth step in the process, to determine whether a claimant is capable of performing other work or is disabled, the ALJ may use the Medical-Vocational Guidelines (the "grid rules"). However, use of the grid rules is only appropriate "when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999). In the present case, the ALJ found that Watson did not have any significant non-exertional impairments that would affect his medium residual functional capacity. Consequently, the ALJ applied the grid rules, determined that there were jobs available for Watson to perform, and found that Watson was not disabled.

Watson asserts that the ALJ erred in finding that he did not have significant non-exertional impairments, arguing that his back pain constitutes such an impairment. The ALJ relied for this finding on the opinion of a state medical consultant, who concluded in September 1997 that Watson possessed a medium residual functional capacity. The opinion of the state medical consultant regarding Watson's residual functional capacity is not relevant to whether Watson's back pain constitutes a significant non-exertional impairment. However, the ALJ also relied on Dr. Messina's testimony that Watson could return to work with minimal restrictions, and on the report of the physical therapist that

7

Watson experienced only slight residual pain after the therapy. The ALJ also found that Watson's statements about his pain were not credible, due to inconsistencies in his testimony. The testimony of Dr. Messina and the physical therapist constitute substantial evidence to support the ALJ's finding.

III. The Singletary standard

Watson argues that the ALJ erred in failing to make a determination that Watson could maintain employment. In *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986) this Court held that "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Id.* at 822. The defendant-appellee argues, and the district court held, that the *Singletary* standard applies only to cases of mental illness or episodic deterioration, not physical disability. The district court pointed out that *Singletary*, and a subsequent case applying the standard, *Leatherwood v. Houston Post Co.*, 59 F.3d 533 (5th Cir. 1995), involved a claimant who suffered from mental illness. However, while it is true that *Singletary* and *Leatherwood* applied the standard to persons suffering from mental illness, this does not necessarily imply that the standard cannot be applied to people who are physically disabled.

Indeed, we have already applied the *Singletary* standard to a case involving a woman who suffered from keratosis. *See Wingo v. Bowen*, 852 F.2d 827 (5th Cir. 1988). In that decision, this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (citing *Allred v. Heckler,* 729 F.2d 529, 533 (8th Cir.1984)). The dissent contends that this language in *Wingo* amounts to dicta, arguing that we decided the case solely on the ground that the Secretary must consider all of an individual's limitations when making a determination of ability to engage in substantial gainful activities. But to label this language as dicta would render the decision in *Wingo* senseless. The Secretary's error in *Wingo* was not simply the failure to consider all of the claimant's impairments, but more importantly, the Secretary's failure to make a determination that the claimant was capable of maintaining employment. It was because the Secretary was required to make that

9

determination that it was necessary to consider the claimant's non-exertional limitations, in addition to her exertional limitations.

The defendant-appellee seeks to cabin the holding in *Wingo*, arguing that *Wingo* requires a finding of an ability to maintain employment only where the individual suffers from additional non-exertional limitations that might limit the individual's ability to work.[2] This narrow reading of *Wingo* would create an irrational distinction, requiring a finding that a person can maintain employment where the individual suffers from additional non-exertional limitations, and not requiring such a finding where the individual suffers solely from exertional limitations. The individual's ability to maintain employment should be relevant to a determination of disability regardless of whether the individual suffers from non-exertional limitations. In the present case, if Watson's degenerative disc disease prevented him from maintaining employment (e.g., because every number of weeks he lost movement in his legs) this would be just as relevant to a finding of disability as if his back pain prevented him from maintaining employment (e.g., because every number of weeks he was in too much pain to work). This interpretation is further supported by the fact that other federal appellate courts have made similar holdings, arguing that "[a] condition that does not allow a person to work on a

---

[2]While the dissent accuses us of setting up a straw man by addressing this issue, we consider it appropriate to respond to the arguments advanced by the parties.

10

regular basis precludes substantial gainful activity."  *Dix v.*

*Sullivan*, 900 F.2d 135, 138 (8th Cir. 1990)[3]; *see also Broadbent v.*

*Harris*, 698 F.2d 407, 413 (10th Cir. 1983).

*Wingo* is properly interpreted as applying the *Singletary*

standard to determinations of physical disability.  Consequently,

we find that the ALJ erred in failing to determine whether Watson

was capable not only of obtaining, but also maintaining employment.

### CONCLUSION

There is substantial evidence to support the ALJ's findings

that Watson is capable of performing medium work and that Watson's

back pain does not constitute a significant non-exertional

impairment.  However, the ALJ erred in failing to determine whether

Watson was capable not only of obtaining employment, but also

maintaining it.  Therefore, we VACATE the district court's judgment

affirming the ALJ's decision, and REMAND to the district court with

---

[3]The dissent argues that we interpret *Dix* too broadly, and
that *Dix* stands only for the proposition that the *Singletary*
standard applies in cases where a claimant suffers from a
disability that periodically affects his or her ability to work.
But this interpretation of *Dix* has it exactly backwards: the
purpose of applying the *Singletary* standard in the context of
physical disabilities is to make the determination whether the
claimant has a disability that periodically affects his or her
ability to work, such that the claimant cannot engage in
substantial gainful activity.  It would be pointless to apply the
standard after that determination has been made.  Moreover, by
interpreting *Dix* in this manner, the dissent implicitly accepts
that the regulations do not adequately address all cases of
physical disability.  It is precisely for that reason that the
*Singletary* standard must apply in physical disability cases.

11

instructions to REMAND to the Secretary for further proceedings to determine whether Watson was capable of maintaining employment.

ENDRECORD

EMILIO M. GARZA, Circuit Judge, dissenting:

This case requires us to determine if the appellant, Daniel Watson, is entitled to disability and supplemental security benefits under the Social Security Act. 42 U.S.C. § 423(d). Specifically, we must decide whether the Secretary of Health and Human Services (the "Secretary") applied the correct legal standard in concluding that Watson was capable of performing other work and therefore was not disabled. The majority, relying on our decision in *Singletary v. Bowen*, holds that the Secretary erred by not making a specific finding that Watson could maintain employment. 798 F.2d 818 (5th Cir. 1986). In contrast to the majority, I believe that the Secretary was not required to make such a specific finding when evaluating Watson's claim. Rather, in cases such as Watson's, in which the applicant alleges only a physical disability, the usual five-step sequential inquiry set forth in the federal regulations is the appropriate method to determine whether an applicant is capable of engaging in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b)-(f).

As the majority points out, the Secretary ordinarily evaluates disability claims under the five-step sequential process set forth in 20 C.F.R. § 404.1520.[4] At issue here is the Secretary's

---

[4]The five steps are: (1) whether the claimant is not presently working, (2) whether the claimant has a severe impairment, (3) whether the impairment is not listed in, or equivalent to, an

-13-

application of the fifth step in that inquiry, which asks whether the impairment prevents the applicant from performing any substantial gainful activity other than his or her original employment. In determining whether the claimant can do any other work under the regulations, the Secretary considers the claimant's residual functional capacity, together with his age, education, and work experience, according to the Medical-Vocational Guidelines. *See* 20 C.F.R. § 404.1561. Using these criteria, the Secretary found that Watson possessed the requisite residual functional capacity to perform jobs that required a medium level of work.[5] The regulations define medium work as work that "involves lifting of no more than 50 pounds at a time with *frequent* lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c) (emphasis added). Thus, the Secretary specifically found that Watson could frequently lift up to 25 pounds and, on occasion, lift as much as 50 pounds. Based in part on this determination, the Secretary concluded that Watson was physically capable of performing other types of substantial gainful activity that required medium or less strenuous work levels.

_____

impairment listed in Appendix 1 of the regulations, (4) whether the impairment prevents the claimant from doing past relevant work, and (5) whether the impairment prevents the claimant from doing any other substantial gainful activity. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

[5]The majority concedes in their opinion that the Secretary's determination that Watson was capable of performing jobs that required medium work was supported by substantial evidence.

The majority reasons that the Secretary should have then determined, in addition to the findings required under the regulations, that Watson could maintain an employment position requiring a medium level of physical exertion. In support of their argument, they rely on our decision in *Singletary*. *Singletary* involved a disability applicant who was suffering from a variety of serious mental illnesses, including schizophrenia, delusions, and an anti-social personality disorder. The Secretary applied the five-step process under the regulations and found that Singletary was not disabled. *Singletary*, 798 F.2d at 820. We reversed the Secretary's determination, holding that he must consider whether an applicant with a serious mental illness is capable of engaging in substantial gainful activity when, although physically capable of working, he or she cannot maintain regular employment. *Id.* at 823.

The majority's application of *Singletary* in the context of a physical disability case is misplaced. The applicant in *Singletary* suffered from mental illnesses. Thus, even though he possessed the residual functional capacity to perform certain types of work, his mental disability precluded him from working for any extended period of time. We concluded that usual five-step inquiry under the regulations, which focuses primarily on physical disabilities, did not adequately address a mental disability. Thus, we held that an additional determination that the applicant

-15-

could maintain employment was necessary. In doing so, we acknowledged the limitations in the regulations in evaluating mental disability claims:

> Determining whether a claimant is disabled because of a mental condition under the above sequential process can be a difficult task. In some cases, the mental impairment may be so severe that the claimant is presumed to be incapable of working. . . . Quite often, however, the claimant is capable of finding a job and working for short periods of time. The nature of the mental impairment is such, however, that the claimant is unable to remain employed for any significant period of time.

*Singletary*, 798 F.2d at 820-821 (internal citation omitted). *Singletary's* requirement that the Secretary must make a specific additional finding that a disability applicant with a mental illness is able to maintain employment in order to be capable of engaging in substantial gainful activity was intended to address the difficulties arising when applying the regulations to a mentally disabled applicant. Because the residual function inquiry focuses on an applicant's physical capabilities and not on any mental disabilities, we concluded that an additional inquiry was necessary to address such cases.

Here, however, Watson only asserts a physical disability. The residual function determination made by the Secretary adequately deals with such claims. The Secretary found, based on substantial evidence, that Watson retained the residual functional capacity, in spite of his disability, to lift 50 pounds at any one time and to lift frequently up to 25 pounds. The Secretary's physical

disability determination, therefore, includes a determination that Watson was both physically capable of performing medium work and of maintaining a job requiring a medium level of physical exertion over an extended period of time.  Thus, it would be redundant to require the Secretary to make an additional finding that Watson was physically capable of maintaining employment beyond the determination that he was physically capable of frequently lifting up to 25 pounds.

This distinction between mental and physical disabilities is not a distinction without a difference as the majority contends. An applicant with a mental illness may be physically capable of performing certain jobs, but yet ultimately unable to engage in substantial gainful activity.  Here, however, the Secretary's determination that Watson retained the residual functional capacity to frequently lift 25 pounds means that he is physically capable of engaging in that type of substantial gainful activity.  No additional determination is necessary.  The concerns that motivated our decision in *Singletary* are not present in the context of a physical disability claim.

The majority also relies on our decision in *Wingo v. Bowen* for the proposition that the Secretary was required to make an additional finding that Watson could maintain employment.  852 F.2d 827 (1988).  In *Wingo*, the Secretary determined that the disability applicant was qualified to perform sedentary work.  We concluded

-17-

that the Secretary had failed to consider the applicant's other, non-exertional limitations in reaching his conclusion that the applicant was not disabled. We stated: "When making his determination that Wingo could perform gainful employment, the Secretary failed to consider this combination of impairments, and we cannot say therefore that this decision was supported by substantial evidence." Thus, *Wingo* stands solely for the proposition that the Secretary must consider all of a disability applicant's physical and mental limitations when determining whether he or she can engage in substantial gainful activities.

The majority focuses on dicta in *Wingo*, arguing that it applies *Singletary's* requirement that the Secretary make a specific finding that a disability applicant can maintain employment when evaluating a physical disability claim. In *Wingo*, the Secretary determined that the applicant could sit for as many as six hours. Based on this evidence, the Secretary concluded that the applicant could perform sedentary work. We stated that "[t]his particular capability would qualify Wingo to perform sedentary work only in a theoretical sense, however. To be capable of performing sedentary work under the guidelines, an individual must have some reasonable chance in the real world of being hired and, once hired, of keeping the job." *Wingo*, 852 F.2d at 831. The regulations define sedentary work as work which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like

-18-

docket files, ledgers and small tools. Although sedentary work is defined as work which involves siting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 416.967(a). We concluded in *Wingo* that a finding that an applicant can sit for up to six hours does not satisfy the definition of sedentary work in the regulations. Rather, the definition of sedentary work includes a finding that the applicant can sit, carry small objects, stand, and walk on a daily basis. We did not fault the Secretary for failing to make an additional finding that the applicant could not maintain employment. Instead, we noted that the Secretary had failed to apply the regulations properly in reaching his or her conclusion. Thus, "the Secretary's determination that [the applicant] can perform these [sedentary] jobs [was] mere speculation."[6] *Id.* (citing *Fields v. Bowen*, 805 F.2d 1168, 1171 (5th Cir. 1986)).

In this instance, however, the majority concedes that the Secretary's determination that Watson was able to perform medium labor was supported by substantial evidence. In other words, the Secretary correctly applied the regulations, concluding that Watson

---

[6]The majority opinion sets up a straw man by arguing that *Singletary* cannot be limited to cases only involving a mixture of exertional and non-exertional limitations as in *Wingo*. This argument ignores the import of the *Wingo* decision. *Wingo* held that the Secretary must consider all of the claimant's disabilities when making his disability determination. It then argued in dicta that the Secretary must properly apply his or her own regulations. Thus, the distinction between exertional and non-exertional limitations that the majority draws does not address the basic fact that *Wingo* does not represent an extension of *Singletary* to the context of physical disabilities altogether.

could perform jobs which required him to *frequently* lift up to 25 pounds. The dicta in *Wingo*, which neither mentions *Singletary* nor requires any additional findings beyond what is required in the regulations, mandates only that the Secretary comply with the requirements of the regulations.

Finally, the majority relies on an Eighth Circuit decision to support its extension of our holding in *Singletary*. *Dix v. Sullivan*, 900 F.2d 135 (8th Cir. 1990). In *Dix*, the disability applicant suffered from Crohn's disease, an inflammatory disease affecting the gastrointestinal tract. Crohn's disease is characterized by periods of inactivity in which the patient is relatively symptom free, followed by periods of severe pain. *Dix*, 900 F.2d at 135. Like *Singletary*, the court in *Dix* confronted a specialized case where the regulations failed to adequately address the disabilities of a particular applicant. Similar to an applicant with a mental illness, Dix was physically able to obtain employment during her remissions, but was unable to work during her relapses. Thus, the *Dix* court concluded that the Secretary's residual function determination under the regulations was insufficient because the applicant had no realistic chance of retaining work. *Dix* extends *Singletary* to the context of physical disabilities, but only to those disabilities which periodically affect an applicant's physical ability to work. This extension is inapplicable to the facts of this case, however, because Watson

-20-

suffers from back pain and degenerative disc disease. These afflictions, unlike Crohn's disease or a mental illness, directly impede an applicant's physical ability to perform certain types of work. The residual function inquiry directly addresses these types of limitations and an additional inquiry is unnecessary.

The majority's decision represents an unnecessary extension of our decision in *Singletary* to the context of physical disabilities. The federal regulations governing the determination of an applicant's residual functional capacity already provide the appropriate method for evaluating physical disability claims. The application of *Singletary* to cases such as Watson's is redundant and only tends to confuse an already complicated regulatory process without affording deserving applicants any extra protections.

For the foregoing reasons, I would AFFIRM the judgment of the district court.